UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 20-CIV-21047-KMM

MABINTY ALUKO,

    Plaintiff,

vs.

CARNIVAL CORPORATION,

    Defendant.

_____/

**DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR WILLFUL MISCONDUCT AND FOR SANCTIONS**

    Defendant, CARNIVAL CRUISE LINE ("Carnival"), hereby files its Motion to Dismiss Plaintiff's Complaint for Willful Misconduct and For Sanctions, and as grounds states as follows:

**I.    Introduction**

    Throughout the course of discovery, Mabinty Aluko (hereinafter "Plaintiff"), has repeatedly concealed, failed to disclose, and failed to timely supplement information necessary for Carnival's defense of Plaintiff's claims. Plaintiff's discovery violations began with her willful misrepresentation in response to Carnival's discovery regarding her possession of pertinent medical records and information on her medical history prior and subsequent to the alleged incident onboard Carnival's vessel. This behavior continued throughout discovery. Plaintiff's pervasive pattern of misrepresentations and withholding of vital information and documents, as outlined below, resulted in extreme prejudice to Carnival for which the only appropriate remedies are sanctions beyond exclusion of this information at trial, including dismissal with prejudice, or in the alternative, for imposing an adverse inference or any other sanction this Court deems appropriate, as well as for reimbursement of Carnival's attorney's fees and costs.

1

## II. Facts supporting sanctions

### A. Background

This is a maritime personal injury action brought by Plaintiff for injuries arising from a March 17, 2019, incident onboard the Carnival *Conquest*. Plaintiff alleges that she was seated in the main atrium of the ship adjacent to a stage when she was struck on the back of her head and neck with a microphone/iPad stand[1] being set up by a Carnival musician/crewmember. [DE 1]. As a result of this incident, Plaintiff claims she sustained injury to her head and neck and, as a consequence, suffers from headaches, memory and concentration issues, neck pain, loss of sleep, and numbness and tingling in her arms. *See* Plaintiff's Response to Carnival Interrogatory 10, [Compound Exhibit A, at 6] ("I sustained injury to my head and neck. As a consequence, I have suffered from intractable headaches and neck pain, as well as loss of sleep."); *see also* Plaintiff's deposition transcript, [Exhibit B, at 197:21-198:5][2] ("I've got a headache on a daily basis, neck pain…I have memory difficulties, I have light sensitivity, noise sensitivity, I have sleep difficulties […]"). Plaintiff repeatedly and explicitly denied that **any** of these issues pre-dated the subject incident. *See e.g.,* Deposition of Plaintiff, [Exhibit B, at 80:3-7; 178:7-17; 199:3 -200:7; 200:22 -201:5; 209:14 -210:6].

### B. Plaintiff willfully withheld information and documents regarding her medical treatment prior and subsequent to the alleged incident

#### a. Post-incident MRI of Plaintiff's cervical spine

On June 10th, 2020, Carnival propounded a request for production which required Plaintiff to produce copies of all medical reports and records received from any physicians, doctors, hospitals or other health care providers who treated her for her alleged injuries resulting from the incident. *See* Defendant's Initial Request for Production 11, [Exhibit C]. Only physical therapy records and a report

---

[1] Similar to a singer's microphone stand.
[2] Defendant will file Plaintiff's deposition transcript [Exhibit B] separately due to an error with this Court's CM/ECF system, presumably due to the file size.

from a CT scan of Plaintiff's brain were initially produced. Further, Carnival's interrogatory 11 sought the identity of all medical providers who treated Plaintiff for her alleged injuries arising from the incident. Plaintiff's initial response to this interrogatory excluded the provider who performed this MRI. [Compound Exhibit A, at 6]

Plaintiff was examined by Defendant's experts on October 28, 2020, and November 2, 2020.[3] At these examinations, and unbeknownst to Defendant, Plaintiff brought with her and showed these doctors a report from an MRI taken of her cervical spine. Plaintiff then admitted in her November 17, 2020, deposition that she was in possession of a March 10, 2020, MRI report of her cervical spine taken during her treatment for injuries alleged to have arose from the incident. [Exhibit B, at 186:14-186:21]. Despite Plaintiff's knowledge that this was **directly** responsive to Carnival's initial discovery requests, this MRI report was not produced until November 20, 2020, after Defendant discovered it was in her possession and specifically demanded production of this undisclosed report.[4] [5]

Upon receiving this report on November 20, 2020, Carnival found that there is no indication of where the MRI was conducted. There is no doubt Plaintiff was aware that this information was **directly** responsive to Carnival's Interrogatory 11 and was required to be timely supplemented if the party learns the response is incomplete or incorrect. Fed. R. Civ. P 26(e)(1)(A). That same day, Carnival wrote to Plaintiff's counsel requesting she supplement her response to Interrogatory 11. Plaintiff did not supplement her response with the relevant information until December 7, 2020, following Carnival's attempt to compel better responses. [Compound Exhibit A, at 14-15] As this information was vital to Carnival's ability to locate and obtain copies of the MRI films, the untimely production of this report

---

[3] Defendant's orthopedic expert, Dr. J. Clark Race, examined Plaintiff on October 28, 2020. Defendant's neurology expert, Dr. John Bertelson, examined Plaintiff on November 2, 2020.
[4] A copy of this MRI report is attached as Exhibit D.
[5] At the time of Plaintiff's production of this MRI report, the discovery cutoff was November 20, 2020—that same day. Following Defendant's November 20, 2020, Motion for Clarification of the Scheduling Order [DE 29], this Court enlarged discovery cutoff to December 31, 2020 [DE 30].

(on the day of the then discovery cutoff), and untimely supplementation of her interrogatory response (just over 3 weeks before the amended discovery cutoff), inhibited Carnival's ability to obtain such films prior to the discovery cutoff. Even after the discovery cutoff date, Carnival had kept working to obtain the films, which were only received from the provider yesterday, January 21, 2021. Since discovery has ended, Carnival is extremely prejudiced by the inability to use the films to support its defense of these claims.

    b. **Tricare Explanation of Benefits records**

On December 7, 2020, just over three weeks prior to discovery cutoff, Plaintiff served a supplement to her response to Carnival's Initial Request for Production. This supplemental response included Plaintiff's health insurance explanation of benefits ("EOB") and lien documents from her insurer, Tricare. [Exhibit E] These EOBs have various "date[s] of notice" beginning on April 8, 2019, and continuing on a near monthly basis until well into 2020. These "date[s] of notice" suggest that Plaintiff was receiving these insurance documents on a regular basis since April 2019, but failed to timely supplement her responses to Carnival's initial discovery requests upon receipt of these insurance documents.

The EOB documents seemingly sent to Plaintiff by Tricare on April 8, 2019, June 6, 2019, July 8, 2019, and January 16, 2020, indicate bills for medical equipment rentals, including devices for treatment of Plaintiff's sleep apnea, at Georgetown Durable Medical Equipment ("Georgetown DME").[6] [Exhibit F] **This provider was not disclosed at any point** in her Responses to Carnival's Interrogatories, including interrogatories asking for all health care providers who had treated her for any injuries for which she seeks damages and for all health care providers who had treated her in the 10 years preceding the incident. *See* Plaintiff's Responses, and Supplements thereof, to Carnival's Interrogatories 11 and

---

[6] A subpoena was served on Georgetown DME on December 15, 2020.

13, [Composite Exhibit A]. Carnival only found these records after its close examination of the piecemeal Tricare records that were themselves untimely produced. However, this provider was **directly** responsive to these interrogatories and essential to Carnival's defense of these claims since Plaintiff treated with them for sleep apnea—one of the conditions alleged to have resulted from the incident—both prior and subsequent to the subject incident. *See* Georgetown DME Records, [Exhibit F]. As detailed in greater depth below, Plaintiff suffered from sleep apnea and other sleep issues long before the incident and contrary her explicit testimony that she did not experience sleep issues prior to the incident. *See* Plaintiff's Response to Carnival Interrogatory 10, [Compound Exhibit A, at 6] ("I sustained injury to my head and neck. As a consequence, I have suffered from intractable headaches and neck pain, as well as loss of sleep."); *see also* Plaintiff's deposition transcript, [Exhibit B, at 197:21-198:5] ("I've got a headache on a daily basis, neck pain…I have memory difficulties, I have light sensitivity, noise sensitivity, I have sleep difficulties […]"). Despite these prior, undisclosed sleep issues, Plaintiff testified as follows:

> Q: […] all these things that we've discussed today you attribute to being clunked on the head by that music stand on the ship?
>
> A: Yes, sir.
>
> Q: There is no other reason in your life or your background that would explain why you have these problems other than being clunked on the back of the head by the music stand?
>
> A: Yes, sir.

*See* Plaintiff's deposition transcript, [Exhibit B, at 209:14 -210:6].

The EOB document seemingly sent to Plaintiff by Tricare on February 12, 2020, indicate bills for multiple x-rays and a medical office visit at Atlas Medical Group on December 16, 2019. This provider was disclosed in Plaintiff's Second Supplemental Responses to Carnival's Interrogatories

5

served on December 29, 2020, two days before the discovery cutoff. The provider was disclosed by Plaintiff as Bryce Cunningham, DC [Compound Exhibit A, at 21].

For the foregoing reasons, each of the above-mentioned undisclosed providers possessed information essential to Carnival's defense of Plaintiff's claims.

### c. Various undisclosed evidence concerning treatment for sleep apnea, insomnia, headaches, memory issues and concentration issues

Plaintiff alleges that she is suffering from sleep issues as a result of the incident. *See* Plaintiff's Response to Carnival Interrogatory 10 [Compound Exhibit A, at 6] ("I sustained injury to my head and neck. As a consequence, I have suffered from intractable headaches and neck pain, as well as loss of sleep."); *see also* Plaintiff's deposition transcript, [Exhibit B, at 197:21-198:5] ("I've got a headache on a daily basis, neck pain…I have memory difficulties, I have light sensitivity, noise sensitivity, I have sleep difficulties […]"); Plaintiff's deposition transcript, [Exhibit B, at 177:21-25] ("Sometimes I would wake up in the morning and I will have […] a headache the whole day. Like the whole day. And then, you know, sometimes like maybe two hours and sometimes three hours."). Plaintiff also testified that she was not suffering from any injury, physical infirmity, disability, or sickness at the time of the incident. *See* Plaintiff's Responses to Carnival Interrogatory 5 [Compound Exhibit A, at 5]; *see also* Plaintiff's deposition transcript, [Exhibit B, at 209:14 -210:6]. However, Carnival has uncovered medical records contained within the [undisclosed] Georgetown DME records which indicate Plaintiff was suffering from, and treating for, sleep issues which were not disclosed, for years preceding the incident. [Exhibit F] Records recently obtained from undisclosed providers (which Carnival found only after combing through Plaintiff's production of the piecemeal Tricare records) suggest Plaintiff's sleep issues also involve other symptoms, including preexisting headaches, memory issues, and concentration issues.

Carnival first caught wind of potential preexisting sleep issues when Plaintiff supplemented her responses to Carnival's Initial Requests for Production on October 19, 2020, with patient portal records

6

from Baylor, Scott & White, an Austin, Texas medical clinic.[7] These records indicate that Plaintiff was seen at Baylor, Scott & White for obstructive sleep apnea on December 5, 2017, but provided no further information on this condition.[8] Plaintiff has not disclosed in any of her discovery responses that she suffered from obstructive sleep apnea, and would not have been found but for Carnival's own uncovering of this note. Nevertheless, Plaintiff continued alleging, and pursuing damages for sleep issues as a result of the subject incident.

Records subpoenaed from Dr. Thikra Kadhim, Plaintiff's former primary care provider, include a record from an October 4, 2013, visit to Dr. Kadhim at which she complained of headaches, migraines, and blurred vision while wearing glasses.[9] [10] *See* Dr. Kadhim's October 4, 2013 encounter record, [Exhibit G]. Nevertheless, Plaintiff testified that she never had a history of migraines:

Q: […] Is there any history of migraines that you have over the years?

A: No, sir.

Q: It's never been a problem for you?

A: No, sir.

[Exhibit B, at 80:3-7]

Dr. Kadhim's records also reference treatment for sleep apnea by Dr. Freddie Morales at the Pulmonary and Sleep Medicine Associates of Central Texas. Neither Dr. Morales nor the Pulmonary and Sleep Medicine Associates of Central Texas were disclosed in any of Plaintiff's interrogatory responses,

---

[7] Baylor, Scott & White have multiple locations in Austin, Texas and the surrounding areas. Plaintiff was treated at several of their locations

[8] Carnival issued subpoenas to Baylor, Scott & White on November 9, 2020. Baylor, Scott & White indicated that they would not be complying with any subpoenas as they were issued by an out-of-state court. Carnival sent Plaintiff authorizations for release of her Baylor, Scott & White records on November 18, 2020 but did not receive them back until December 4, 2020. Carnival then sent records requests and authorizations to Baylor, Scott & White on December 7, 2020.

[9] Plaintiff disclosed Dr. Kadhim in her initial response to Carnival's Interrogatory 13 yet failed to list dates or nature of treatments rendered. *See* [Compound Exhibit A].

[10] Dr. Kadhim indicated the headaches could be linked to Plaintiff's blurred vision and referred her out to a specialist for which Carnival does not have a name or records.

nor in any supplement thereof. [Compound Exhibit A] The records received from Dr. Kadhim include a report of an April 10, 2012, visit to Dr. Morales which state Plaintiff was possibly suffering from sleep apnea and prescribing an overnight sleep study. Dr. Kadhim's records also contain a report from a June 6, 2014, visit to another undisclosed physician, Dr. Randy McCollough, for unrelated cardiac problems. These records, however, also mention Plaintiff's sleep apnea and reference her history of treatment with Dr. Morales for same. These records were all of extreme importance to Carnival's defense since they unequivocally establish that Plaintiff's headaches and sleep issues for which she claims damages, in fact predated the incident.

In the Georgetown DME records received on January 5, 2021, Carnival discovered additional undisclosed providers, including Jennifer Lee Engel, PA-C, and Dr. Swapna Palla, MD.[11] The Georgetown DME records contain a record of a February 6, 2018, visit where Ms. Engel noted Plaintiff reported experiencing early morning headaches, memory/concentration problems, and was positive for headaches during this visit. This record also indicates that it had been several years since Plaintiff had a sleep study performed for her obstructive sleep apnea. The Georgetown DME records also contain a record of a May 15, 2018, visit to Dr. Palla indicating Plaintiff experienced headaches twice a month and again diagnosing her with obstructive sleep apnea. These records stating Plaintiff's complaints of recurring headaches, memory and concentration issues **predate the incident**. In addition to predating the incident, these prior conditions directly relate to Plaintiff's claims and were all explicitly denied by Plaintiff.

Plaintiff's apparent regular reporting of her history of sleep apnea, insomnia, and headaches to the above undisclosed doctors she visited, indicates her awareness and willful concealment of these preexisting conditions throughout the course of litigation. Nondisclosure of such longstanding and

---

[11] Dr. Palla is a doctor who Plaintiff saw at Baylor, Scott & White's Avery Ranch location.

impacting medical conditions (including years of sleeping with a c-pap device strapped to her face) eliminate any possibility that Plaintiff had forgotten about such conditions; not to mention that she was treating for such conditions just prior to the incident. Moreover, Plaintiff has an apparent long history of treatment for these undisclosed issues which she alleges arose as a result of the subject incident, further indicating the willfulness of her concealment. For the foregoing reasons, each of the above-mentioned undisclosed providers possessed information essential to Carnival's defense of Plaintiff's claims.

### d. Undisclosed evidence concerning neck pain, numbness, pain, and tingling in upper extremities

Plaintiff alleges that she is suffering from neck pain, as well as numbness and tingling in both arms, as a result of the incident. *See* Plaintiff's Response to Carnival Interrogatory 10 [Compound Exhibit A, at 6] ("I sustained injury to my head and neck. As a consequence, I have suffered from intractable headaches and neck pain, as well as loss of sleep."); *see also* Plaintiff's deposition transcript, [Exhibit B, at 197:21-198:5] ("I've got a headache on a daily basis, neck pain, and now also because of the fact that I've got, you know, neck pain, then it's all like here as well, you know, neck pain. You know, on both sides of my neck. The left here is more than the right, neck pain…and I have, you know, numbness in both arms going down.").

The records received from Dr. Khadim include a November 19, 2011, report of an electrodiagnostic study of Plaintiff's cervical spine and bilateral upper extremities performed by another undisclosed doctor, Dr. Richard Hubbard, M.D., J.D., to address pain and numbness in Plaintiff's bilateral wrists, hands and fingers. This electrodiagnostic study revealed early signs of neuropathy but ruled out cervical radiculopathy. *See* Dr. Hubbard's November 19, 2011 Record, [Exhibit H].

Plaintiff also made representations to both of Carnival's medical experts and to her own expert that she has numbness and tingling in her arms and that she did not have previous headache or neck pain prior to the accident in question. *See* Report of Dr. Kenneth Fischer ("Ms. Aluko experiences left

9

posterior neck pain radiating into her left shoulder with weakness and tingling in her left arm. That numbness is particularly in the left middle and index fingers. The patient has not had previous headache or neck pain prior to the accident in question."); *see also* Report of Dr. John Bertelson ("Since roughly 2019, there has been bilateral numbness and tingling extending from the upper deltoid which extends in a continuous line to the index finger and thumb."); *see also* Report of Dr. J. Clark Race ("The plaintiff reports that her symptoms began after she was struck on the head by some type of object, size and weight unknown.")

Additionally, following the incident, Plaintiff sought treatment for her neck complaints at an undisclosed provider, Atlas Medical Group. This was only uncovered after Carnival's careful combing through the Tricare records produced by Plaintiff on December 7, 2020. Carnival subpoenaed these records and received them on January 20, 2021. Carnival is still examining these records.

Each of Plaintiff's above failures to disclose medical providers or produce responsive records in her possession constitutes a blatant disregard for the rules and obligations of discovery. Plaintiff was well aware of the conditions for which she suffered and sought treatment prior to the shipboard incident, including preexisting sleep issues, headaches, numbness and tingling in her upper extremities, memory issues, and concentration issues. Her concealment, nondisclosures, and misrepresentations regarding her preexisting conditions and ultimately her alleged damages cause extreme prejudice to Carnival by depriving it of the ability to investigate the merits of Plaintiff's claims. Further, these concealments, nondisclosures, and misrepresentations are **<u>central</u>** to Plaintiff's claims, rather than an ancillary issue. Notwithstanding her concealment of preexisting conditions, Plaintiff's failure to disclose all of her providers who treated her for injuries arising from the incident hampered Carnival's [and its experts'] ability to investigate the merits of and appropriateness of her claimed damages and treatment. As such, heightened sanctions, including dismissal, are undoubtedly appropriate.

### III. Legal Analysis

**A. The Court has authority to dismiss Plaintiff's case with prejudice as a sanction for the pervasive misrepresentations, failures to timely supplement and concealment of evidence under common law, Rule 41(b), and Rule 37**

The "overall purpose of discovery under the Federal Rules is to require the disclosure of all relevant information, so that the ultimate resolution of disputed issues in any civil action may be based on a full and accurate understanding of the true facts, and therefore embody a fair and just result." *Reilly v. Chipotle Mexican Grill, Inc.,* 2016 WL 10646561, at *1 (S.D. Fla. Sept. 22, 2016); *State Nat'l Ins. Co. v. City of Destin*, 2015 WL 11109379, at *1 (N.D. Fla. Sept. 1, 2015). Further, Rule 26(e) requires a party to supplement information it has produced in response to a request for production in a timely manner if the party learns the response is incomplete or incorrect. *Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295 (11th Cir. 2020) (*citing* Fed. R. Civ. P 26(e)(1)(A)). The Court has the inherent authority to sanction parties who conduct litigation in bad faith or who perpetrate a fraud on the court. *See Chambers v. NASCO*, 501 U.S. 32, 51 (1991). The power to do so arises from the court's need "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Id*. at 43. "The key to unlocking the court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F. 3d 1212, 1214 (11th Cir. 1998).  Such a finding may be made when a party's conduct delays or disrupts the litigation, or hampers the enforcement of a court order. *See Byrne v. Nezhat*, 261 F. 3d 1075, 1121 (11th Cir. 2001). Bad faith can be predicated upon knowing or reckless conduct. *Scipione v. Advance Stores Co.*, 294 F.R.D. 659, 664 (M.D. Fla. 2013)(*citing Qantum Communications Corp. v. Star Broadcasting, Inc.*, 473 F.Supp.2d 1249 (S.D.Fla.2007)). When determining whether sanctions are appropriate under the Court's inherent authority, "the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case." *Barash v. Kates,* 585 F.Supp.2d 1347, 1362 (S.D.Fla. 2006). Fraud on the court is established "when clear and convincing evidence demonstrates that 'a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's

**FOREMAN FRIEDMAN, PA**, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077

ability impartially to adjudicate a matter by impartially influencing the trier or <u>unfairly hampering the presentation of the opposing party's claim or defense</u>.'" *McDowell v. Seaboard Farms of Athens*, Inc., 1996 WL 684140, at *2 (M.D. Fla. 1996) (citing *Vargas v. Peltz*, 901 F. Supp. 1572, 1579 (S.D. Fla. 1995)(emphasis supplied).

The Eleventh Circuit has endorsed a court's inherent authority to dismiss an action with prejudice where, as here, a party abuses discovery and conceals evidence. *See, e.g. Malautea v. Suzuki Motor Co., Ltd.,* 987 F.2d 1536 (11th Cir. 1993) (entry of judgment against defendants appropriate sanction for willful violation of discovery orders, failing to disclose information without credible explanation – sanction not unjustly harsh where imposition of lesser sanctions would be ineffective). Federal courts have agreed that misconduct such as Plaintiff's warrant the severe sanction of dismissal. *See, e.g. Anheuser-Busch, Inc. v. Natural Beverage Distributors,* 69 F.3d 337, 352 (9th Cir. 1995) (dismissal was appropriate sanction where party's pattern of deception and discovery abuse made it impossible for the district court to conduct a trial with any reasonable assurance that the truth would be available, and the suppressed documents were important to support defense). Furthermore, a party's half-hearted attempt to comply with discovery late in a case does not prevent the imposition of the sanction of dismissal. *See, Anheuser-Busch, Inc., supra* (the Court rejected the party's argument that she "voluntarily" produced documents where she intentionally concealed documents for three years and when she did inform Anheuser-Busch they existed she produced only part of them, noting that failure to comply with discovery "is not purged by belated compliance."); *See also, Laukus v. Rio Brands, Inc.,* 292 F.R.D. 485, 510 (N.D.Ohio 2013 (dismissal appropriate sanction where a party had an ability to comply with discovery but did not, and instead concealed a material document and provided misleading discovery responses – noting that the moving party had been deprived of discoverable evidence which could have been used on summary judgment, mediation, and other facets of the case.).

*McMunn v. Memorial Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445-6 (S.D.NY 2002), is also instructive. The sanction of dismissal for fraud on the court was found appropriate because the actions of a party "seriously impeded" the movant's ability to obtain relevant discovery, and the defendant was required to expend tremendous amounts of money and time to defend claims. *Id.* The Court's commentary goes to the heart of the issues in this case:

> "Our judicial system generally relies on litigants to tell the truth and participate in discovery in good faith. Thus, when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process, it can fairly be said that he has forfeited his right to have his claim decided on the merits. This is the essence of fraud upon the court."

*Id.*

In addition to the inherent power to sanction fraudulent litigation conduct by dismissal, courts have found dismissal appropriate pursuant to Federal Rule of Civil Procedure 41(b). For example, the court in *Pope v. Federal Express Corp.* stated that "[d]ishonest conduct by a party has been recognized as grounds for dismissal with prejudice under Rule 41(b)." 138 F.R.D. 675, 682 (W.D. Mo. 1990), *aff'd in part, vacated in part on other grounds*, 974 F. 2d 982 (8th Cir. 1992) (citation omitted). The court in *Pope* further stated that "[d]ismissal under Rule 41(b) has been held appropriate where plaintiff has engaged in bad faith or egregious conduct, or where plaintiff's conduct threatens the very integrity of the judicial process." *Id*.

Federal Rule of Civil Procedure 37 also gives district courts broad discretion to fashion appropriate sanctions for violations of discovery rules. *See* Fed. R. Civ. P. 37; *Bobroff v. Univ. of Miami*, 2016 WL 6433095, at *3 (S.D. Fla. Oct. 31, 2016); *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1542 (11th Cir. 1993). Sanctions under Rule 37 can be imposed for a variety of purposes, including: "1) compensating the court and other parties for the added expense caused by the abusive conduct; 2) compelling discovery; 3) deterring others from engaging in similar conduct; and 4) penalizing the guilty party or attorney." *Bobroff*, 2016 WL 6433095, at *3; *Nukote Intern., Inc. v. Office Depot, Inc.*, 2015

13

WL 71566, *8 (S.D. Fla. 2015). The sanctions permitted under Rule 37 include, "striking pleadings in whole or in part" and "dismissing the action or proceeding in whole or in part". Fed. R. Civ. P. 37(b)(2)(A)(iii)(v).

Here, Plaintiff's actions clearly evince an intent to hamper Carnival's ability to present its defense and discover her prior conditions. As detailed above, Plaintiff falsely stated in her response to interrogatory 5 that she did not suffer from physical infirmity, disability, or sickness at the time of the subject incident. *See* [Compound Exhibit A, at 5]. Plaintiff provided incomplete responses in each of her initial or any supplemental response to interrogatories 11 and 13, which requested the identities of all medical providers who treated her for injuries she alleges arose from the incident, as well as all medical providers seen for 10 years preceding the incident. *See* [Compound Exhibit A, at 6-7]. Plaintiff also seemingly was in possession of several documents (including the MRI report and Tricare EOB records) responsive to Carnival's requests for production, and which contained information vital to Carnival's defense, yet did not timely supplement with these documents, if at all. Plaintiff's eleventh-hour disclosure of certain medical information and billing records (several of which mention additional undisclosed or untimely supplemented providers) left Carnival extremely prejudiced with an inability to investigate her medical history.

In addition to the misrepresentation contained in Plaintiff's response to Carnival's discovery requests, Plaintiff has also made numerous misrepresentations in her deposition. In this regard, Plaintiff misrepresented at her deposition that she did not suffer from recurring headaches or neck complaints of any kind prior to the incident:

> Q: And these headaches that prompted you to go seek treatment, did you ever have any kind of headaches like that prior to the time of the accident on a recurring basis?
>
> A: No, sir.

> Q: Okay. And this neck pain, did you have any kind of neck pain or neck complaints of any kind at all prior to March of 2019?
>
> A: No, sir.
>
> Q: Not one little bit?
>
> A: No, sir.

See Plaintiff's deposition transcript, [Exhibit B, at 178:7-17].

> Q: Okay. When is the first time that you sought medical care and treatment in Texas upon returning home?
>
> A: I do not recall the exact time, but I have been like, you know, treating myself. Yeah, taking medications. And so it came to a point when I then -- yeah, you know, realized that I might need some more -- more help.
>
> Q: Okay.
>
> A: Help with my headaches. That they were not going away. […]

[Exhibit B, at 169:9-19].

> Q: Has any doctor told you there's any reason for these headaches?
>
> A: It was the object that struck my head that -- that originally brought up my headaches in the first place.
>
> Q: Has the doctor told you that?
>
> A: No.
>
> Q: Okay. That's just you telling me that?
>
> A: Yes.
>
> Q: Which brings up a good point. Has any health care provider of the state of Texas told you that because this stand hit you on the back of your head that you have the headache, the neck pain, the numbness in your arms and the light and noise sensitivity at all?
>
> A: No, sir.
>
> Q: And you would think that if you have these problems that have been going on for a year and a half now, that being a foreign medical graduate and also being an American RN

15

> that you would have a physician that you would have been treating with who would be able to tell you about these problems and their causation?
>
> MR. HERNANDEZ: Form.
>
> THE WITNESS: I did tell them how it all started. So they do have that as the origin of my headaches. So I don't think that they would need to like say no or yes to that because they have that. That's what I will tell them when I see them.
>
> Q:   Sure.
>
> A:   All this started when such and such happened, when I had a hit on my head.

[Exhibit B, at 199:3 -200:7].

> Q:   Okay. And has any doctor told you that stress in your life and other conditions as well could have a role in the causation of your headaches as well as your neck pain?
>
> MR. HERNANDEZ: Form.
>
> THE WITNESS: No, sir.
>
> Q:   Did anybody tell you that there's a particular reason for your headaches, ma'am?
>
> A:   No, sir.

[Exhibit B, at 200:22 -201:5].

In fact, as detailed above, Plaintiff has a long, and well documented history of recurring headaches prior to the subject incident.

Further, Plaintiff misrepresented the nature and history of the numbness and tingling in her arms, despite the earlier mentioned, yet undisclosed, 2011 treatment with Dr. Hubbard for bilateral arm numbness and tingling:

> Q:   Okay. And lastly, you tell me that you have numbness in both your arms going all the way down?
>
> A:   Yes, sir.
>
> Q:   And you attribute that to being clunked on the head by the music stand?
>
> A:   Yes, sir.

16

> **Q:   And for that matter, all these things that we've discussed today you attribute to being clunked on the head by that music stand on the ship?**
>
> **A:   Yes, sir.**
>
> **Q:   There is no other reason in your life or your background that would explain why you have these problems other than being clunked on the back of the head by the music stand?**
>
> **A:   Yes, sir.**

[Exhibit B at 209:14 -210:6]

Plaintiff unequivocally stated, based on these questions and answers that she had no instances of any of her alleged conditions prior to the subject incident. In light of the uncovered evidence proving that Plaintiff suffered from the same or nearly identical conditions prior to the subject incident for which she claims damages, Plaintiff knowingly provided false answers to Carnival's discovery requests and provided false testimony at her deposition. These material misrepresentations undoubtedly warrant dismissal. *See In re: Amtrak "Sunset Limited", Train Crash in Bayou Canot, Ala. On Sept. 22, 1993*, 136 F. 2d 1251 (S.D. Ala. 2001) (granting motion to dismiss based on plaintiff's knowingly false answers to discovery requests); *Qantum Communications Corp. v. Star Broadcasting, Inc*., 473 F. Supp. 2d 1249, 1270 (S.D. Fla. 2007) (sanctions of default judgment and attorneys' fees and costs warranted based on defendant's pattern of misconduct during the course of the litigation, including defendant's lying under oath and failure to produce key "smoking-gun" documents during discovery.); *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F. 3d 337, 348 (9th Cir. 1995) (affirming dismissal of counterclaim based on plaintiff's concealment of documents, stating, "courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice."); *Malautea v. Suzuki Motor Corp*., 987 F. 2d 1536 (11th Cir. 1993) (affirming default judgment based on defendant's failure to comply with court orders and improper discovery responses which caused unnecessary delay); *Laukus v. Rio Brands, Inc*., 292 F.R.D. 485 (N.D. Ohio

2013) (dismissal warranted based on plaintiff's discovery misconduct including, failure to correct inaccurate discovery responses and improper arguments made on his behalf by his counsel).

Any possible argument that Plaintiff might attempt to argue as far as an inability to recall her medical history simply does not hold water. Plaintiff treated for several of the undisclosed conditions for long periods, visiting several providers for treatment of each condition, even participating in an overnight sleep study, and sleeping regularly with a c-pap device strapped to her face. Further, some of the conditions, such as Plaintiff's sleep apnea, were still being treated shortly before, and following, the subject incident.

## CONCLUSION

Based on Plaintiff's repeated discovery misconduct, Carnival respectfully submits that appropriate sanctions should be entered against the Plaintiff. The appropriate sanctions include, but should not be limited to, striking Plaintiff's pleadings and dismissing this action with prejudice; or alternatively, instructing the jury that it must presume the withheld, untimely supplemented, or misrepresented evidence was unfavorable to the Plaintiff; as well as awarding Carnival its costs and attorneys' fees for the filing of this motion and for uncovering any undisclosed medical information.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

Undersigned counsel hereby certifies that the parties have conferred and that Plaintiff is opposed to the relief requested herein.

Dated: January 22, 2021
Miami, Florida

> Respectfully submitted,
> **FOREMAN FRIEDMAN, P.A.**
>
> BY: */s/ Zachary L. Foreman*
> Jeffrey E. Foreman, Esq. (FBN 0240310)
> jforeman@fflegal.com
> Thomas A. Briggs, Esq. (FBN 663034)
> tbriggs@fflegal.com

18

FOREMAN FRIEDMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077

        Zachary L. Foreman, Esq. (FBN 1017993)
zforeman@fflegal.com
One Biscayne Tower
2 South Biscayne Boulevard, Suite 2300
Miami, FL 33131
Tel: 305-358-6555/Fax: 305-374-9077
Counsel for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 22, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to electronically receive Notices of Electronic Filing.

## SERVICE LIST

| | |
|---|---|
| Eduardo J. Hernandez<br>Florida Bar No. 061451<br>ehernandez@ejh-law.com<br>EDUARDO J. HERNANDEZ, LLC<br>10691 N. Kendall Drive - Suite 109<br>Miami, Florida 33176<br>Tel.: (305) 567-0910<br>Fax.: (786) 454-8905<br>Attorney for Plaintiff | Jeffrey E. Foreman, Esq.<br>jforeman@fflegal.com<br>Thomas A. Briggs, Esq.<br>tbriggs@fflegal.com<br>Zachary L. Foreman, Esq.<br>zforeman@fflegal.com<br>FOREMAN FRIEDMAN, PA<br>One Biscayne Tower – Suite #2300<br>2 South Biscayne Boulevard<br>Miami, Florida 33131<br>Tel: 305-358-6555/ Fax: 305-374-9077<br>*Counsel for Defendant* |

**FOREMAN FRIEDMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077**